## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JASMINE WILLIAMS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:14-1526 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

In this case appealing a denial of Social Security benefits, Plaintiff Jasmine Williams has filed a Motion for Summary Judgment [Doc. # 11] and a Brief in Support [Doc. # 12] ("Plaintiff's Brief").  Defendant has filed a Motion for Summary Judgment [Doc. # 13] and a Brief in Support [Doc. # 14] ("Defendant's Brief"). Plaintiff filed a Reply Brief [Doc. # 17]. The motions now are ripe for decision. Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court concludes that Plaintiff's motion should be **denied**, that Defendant's motion should be **granted**.

## I.   BACKGROUND

### A.   Procedural Background

Plaintiff Jasmine Williams filed an application with the Social Security Administration ("SSA") on July 23, 2012, seeking disability benefits under Title II and supplemental security income ("SSI") benefits under Title XVI.  She alleges onset of disability on February 8, 2012.   After being denied benefits initially and on reconsideration, Williams timely requested a hearing before an Administrative Law Judge ("ALJ") to review the denial.

On July 29, 2013, Plaintiff appeared before ALJ D'Lisa Simmons for an administrative hearing.  R. 32-57.  She was represented by non-attorney representative Denotra Steward.  The ALJ heard testimony from vocational expert Kay Gilreath.

On December 20, 2013, the ALJ denied Plaintiff's request for benefits.  R. 13-31.  On March 27, 2014, the Appeals Council denied Plaintiff's request for review. R. 1-6.  Plaintiff filed this case on June 2, 2014, seeking judicial review of the Commissioner's denial of her claim for benefits.  Complaint [Doc. # 1].

### B.   Factual Background

Williams applied for benefits based on osteoarthritis in her right knee, obesity, depression, hypertension, status-post fractured ankle, type II diabetes mellitus, headaches, anemia, and insomnia.  The relevant period for inquiry is from her alleged

onset date of February 8, 2012, through the ALJ's denial of benefits on December 20, 2013. Williams challenges the ALJ's findings as to her depression and headaches.

In February 2012, Williams was examined at Columbia Conroe Regional Medical Center after complaining of chest pain and shortness of breath. Medical personnel administered x-rays and CT scans, which showed no abnormal results. R. 256-58; R. 414-16.

In May 2012 Williams was treated for bronchitis and right knee pain at Lone Star Family Health Center. Williams was prescribed medication for her knee pain and was referred to an orthopedist for evaluation of a possible meniscal tear. Although the records contain an initial notation that Williams had a headache in her forehead for two days, they do not contain any further mention or analysis of her headache, nor an indication that Williams was medicated for the headache. R. 361-62. Williams continued treatment at Lone Star in June and July. R. 347-57. She received follow up care for her knee, gynecological care, and other services. The records from several appointments with physicians in June and July do not reflect that Williams complained of, or was medicated for, headaches. *See* R. 351 (in review of systems on July 5, 2012, Dr. Al-Khudhair notes headaches not present).

In July 2012, Williams again received testing at Columbia Conroe Regional Medical Center for chest pain and shortness of breath, with no acute findings. R.

261-62; R; 390-98, 406-09.  She received follow up care at Lone Star Family Health Center with treatment for hypertension and urinary tract issues.  R. 347-49.

On August 14, 2012, Williams began treatment and counseling for depression at Lone Star Family Health Center.  Williams reported symptoms including loss of interest, fatigue, and poor sleep.  She was prescribed Lexapro and received psychotherapy.  Williams also complained of constant headaches for the past month that included nausea, photophobia, phonophobia, throbbing, and frontal pain.  Dr. Kathleen Watson prescribed Williams medication for migraine headaches and for hypertension, and referred Williams for an MRI of the brain.  Williams was also treated for sleep issues and diabetes.  R. 343-46.   Approximately two weeks later, Williams received psychotherapy at Lone Star for her depression from Deborah Imhoff, LPC-S, and again complained of daily headaches.  R. 342.

On September 8, 2012, Williams attended a consultative examination by Jerry Loving, D.O., for her physical condition. R. 263-70.  Based on Williams' allegations, Dr. Loving evaluated two conditions:  right knee pain and hypertension.  As for her knee pain, Williams reported aching, burning pain, swelling, and popping, rating her pain as 9/10 on most days; she stated that she had difficulty with bending, prolonged standing, and walking.  R. 264.  On examination, Dr. Loving noted "right knee tenderness" but "[n]o joint swelling, erythema, effusion, or deformity," and a normal

range of motion in all areas including her knees.  R. 267.  He further noted normal strength in both knees. R. 268.   He assessed Williams as having "[c]hronic pain right knee/strain sprain with possible internal derangement."   R. 268.   As for her hypertension, Dr. Loving noted that Williams had been diagnosed with hypertension one month before and had been medicated since that time.  Williams reported that the medication "manages her blood pressure relatively well, although she [had] current symptoms of daily headaches with blurry vision, nausea or vomiting twice a week, and trouble focusing."  R. 264.  Her blood pressure at her appointment was 133/84.  Dr. Loving's report contains no record that Williams was experiencing a headache, vision disturbances, nausea or vomiting at the time of her examination.  He assessed her with "[h]istory of new onset hypertension, presently treated and asymptomatic." R. 268.[1]  He concluded that Williams had mild limitations with standing, walking, lifting, and carrying due to right knee pain, but could be expected to sit normally during an eight-hour workday.  He found no limitations resulting from Williams' hypertension, headaches, or any other condition.  R. 268.

On September 11, 2012, Williams attended a consultative examination with

---

[1]     Dr. Loving made this assessment despite his notation elsewhere in his report that Williams attributed her headaches to her hypertension or the medication for that condition.  *See* R. 264, 267.  Although his report states at one point that Williams complained of "daily" headaches accompanied by blurry vision, nausea, and vomiting, R. 264, he elsewhere listed her headaches as "occasional."  R. 267.

Charles Woodrick, Ph.D., a psychologist. R. 293-300.  Williams listed her complaints as depression, memory loss, right knee injury, and hypertension.  She stated that she was being treated at Lone Star Family Health Center for depression and headaches, beginning on August 14, 2012, and had then started Lexapro for depression. R. 294. She also reported taking hydrocodone for headaches and that she had begun a new migraine medication in August.  Williams described an "unhappy" childhood with emotional and physical abuse. R. 295.  She stated that she currently lived with her two children and extended family.  She reported that she was capable of activities of daily living such as feeding and dressing her children, preparing meals, and doing some cleaning and laundry, but that she received some help from her sister. R. 296. She stated that she had her driver's license and was able to leave her home unaccompanied. R. 296.  She reported that she was socially isolated, preferred to be alone, had trouble getting along with family members, and had problems with anger management. R. 296-97.  She stated that she was forgetful regarding appointments and medications, especially during headaches, which she stated prevented her from "think[ing] right." R. 297.  She described her "typical mood" as "depressed, sad and stressed out." R. 297.

Dr. Woodrick conducted a Mental Status Examination and noted no signs of acute distress, formal thought disorder, delusions, or suicidal or homicidal ideation.

R. 297-98.   He noted that Williams described her mood as depressed, and that her affect was depressed and sad.   Williams reported intermittent insomnia and Dr. Woodrick noted "evidence of anhedonia including a loss of interest and enjoyment in doing things she previously enjoyed."  R. 298.  He further noted, "She scored 28/30 on the Mini-Mental Status Exam, a score contraindicative of a dementing disorder or cognitive deficits."   R. 298.   Williams was able to maintain attention and concentration and to remain on task during the examination. R. 299.  Dr. Woodrick assessed her with depressive disorder and a Global Assessment Functioning ("GAF") score of 50, and stated that her prognosis was "[f]air with adequate medical and mental health intervention" and "[g]uarded without."  R. 299.

On September 24, 2012, Williams continued treatment at Lone Star Family Health Center and complained of daily frontal headaches.   R. 340-41.  She stated that she had been given pills for tension headaches which did not help.  Her headaches were aggravated by light and noise and were occasionally accompanied by blurry vision and numbness in her upper left extremities.  She was treated by Khushbu Patel, D.O., who switched Williams from Imitrex to Fioract for her migraines and advised her to follow up with the MRI previously ordered by Dr. Watson on August 14th.  On October 24, she again received therapy for her depression and reported that she was anxious due to the recent denial of her application for disability benefits.  The records

do not reflect that Williams complained of headaches at the appointment.  She was scheduled for a follow-up appointment in January.  R. 334.

Also in October, Williams was assessed by reviewing physicians for the SSA. The reviewer of her physical condition noted her impairments of osteoarthritis in her right knee, hypertension, and obesity, and assessed her physically as being capable of sitting for six of eight hours in an eight-hour workday; of standing for six of eight hours; of balancing and stooping frequently; and of climbing, kneeling, crouching or crawling occasionally.  R. 271-78.   The psychiatric reviewer noted that depression was present but did not satisfy the diagnostic criteria for Listing 12.04, and assessed only mild limitations in Williams' activities of daily living, social functioning, and in maintaining persistence, concentration, and pace.  R. 279-92.  She reviewed Dr. Woodrick's consultative examination report and opined that the assigned GAF of 50 "seems low considering the results of the [Mental Status Exam] as well as the ability to perform [activities of daily living]."  R. 291.  She concluded that the evidence did not reflect a degree of mental or emotional symptoms that would significantly and consistently compromise Williams' work ability.  R. 291.

In November 2012, Williams injured her right ankle while helping her grandmother down the stairs in a wheelchair.  She sought emergency treatment at Columbia Conroe Regional Medical Center, R. 375-416, 433-35.   In November and

December she received follow up care for her ankle at Lone Star Family Health Center.  R.317-74, R. 512-44.

On December 13, 2012, Williams began receiving mental health treatment from TriCounty MHMR Services.  R. 307-316.  Records of her Mental Status Examination note that she was cooperative and well-groomed; that her motor activity was hypoactive; that her affect was flat; that her mood was sad, irritable, anxious, and angry; that she reported auditory hallucinations but no delusions or suicidal ideation; that her concentration was impaired; and that her orientation, insight, and judgment were intact. Although the records contain notations that Williams had a history of tension headaches, they do not reflect that Williams complained of headaches or associated symptoms at the appointment.  Williams reported her past treatment, medication, and counseling for depression beginning in August 2012 and stated that Lexapro had helped somewhat but that she was still depressed.  She was assessed with depression and post-traumatic stress disorder, with a GAF of 47.  Her Lexapro dosage was increased, and she was given an additional prescription for insomnia.  At a follow-up appointment at TriCounty on January 16, 2013, Williams reported that she felt less depressed on the increased dose of Lexapro and that her mood had improved, although she still suffered from insomnia.   R. 436-52.  Her medication for insomnia was changed and she was continued on Lexapro.   The records from her January

appointment reflect no mention of headaches.

On January 25, 2013, a consultant for the SSA conducted a review of Williams' medical records for the period from February 28, 2012 through January 25, 2013.  R. 419-432.  He concluded that a medically determinable impairment of depression was present but did not satisfy the diagnostic criteria for Listing 12.04.  He assessed no restrictions in activities of daily living, mild difficulties in social functioning and in maintaining concentration, persistence, and pace, and no episodes of decompensation. He opined that the medical evidence and Williams' activities of daily living did not suggest any severe limits due to a psychological disorder.

From January through May 2013 Williams continued treatment at Lone Star Family Health Center and was seen eight times for various health issues including knee pain, right ankle pain, diabetes management, and gynecological issues.  R. 513- 44.  She complained of headaches at only one of these eight appointments, on February 1, 2013, when she stated that she had sharp pain on her left and right sides and headaches "all the time" that were relieved by taking medication.  R. 526.  She was seen again on February 8, 2013, for medication refills and reported that she was taking her medications regularly and had "no acute issues."  R. 524.  She was treated in March, April, and May for diabetes management, knee and ankle pain, and hypertension.  R. 514-22, 543.  On May 8, 2013, Williams' records note improved

blood pressure readings and the absence of headaches.  R. 514-515.

In April 2013, Williams continued treatment with TriCounty MHMR.  R. 453-468.  She reported improvement in her symptoms of depression, although recent stress had caused some aggravation of her symptoms, and that trazadone had caused headaches.  Her prescription for trazadone was discontinued.

On April 26, 2013, Williams was treated by Haissam S. Elzaim, M.D., an orthopedist, on a referral from Lone Star Family Health Center.  R. 546-48.   Dr, Elzaim assessed Williams with "severe osteoarthritis tricompartmental" in her right knee.  He also stated that Williams' right ankle had healed.  He administered steroid injections for her knee and instructed Williams to follow up as necessary.

On July 29, 2013, Williams had an administrative hearing before an ALJ. Williams testified that she was trained as a Certified Nurse's Assistant and had worked as a home health aide, but had stopped working in 2012 due to her hypertension, depression, and knee pain.  R. 39-40.  She testified that medication improved her symptoms of depression but that she still was depressed.  R. 45-46.  She stated that medications were helping with insomnia and that she was able to sleep at night.  R. 47.  She testified that she had migraine headaches every other day that lasted four to five hours and that she coped with them by taking medication and going to sleep.  R. 47.  In response to a question from the ALJ, Plaintiff testified that she did

not think she could do sedentary work because of her pain and because of side effects of her medications.  R. 51-52.  A vocational expert testified that a person limited to sedentary work could not do Williams' past work, but could perform other jobs existing in the national economy, including optical goods assembler, charge account clerk, and surveillance system monitor.  R. 53-56.

On December 20, 2013, the ALJ issued her decision denying benefits based on her finding that Williams was capable of performing the sedentary, unskilled jobs identified by the vocational expert.

## II.   SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.  56(a).  *See Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).  "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a

material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

## III.   <u>STANDARD OF REVIEW</u>

Judicial review of the Commissioner's denial of disability benefits is limited to two inquiries: first, whether the final decision is supported by substantial evidence on the record as a whole and, second, whether the Commissioner applied the proper legal standards to evaluate the evidence. *See Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014); *Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).   "Substantial evidence" is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Copeland*, 771 F.3d at 923; *Audler*, 501 F.3d at 447 (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It is more than a mere scintilla and less than a preponderance. *Copeland*, 771 F.3d at 923; *Perez*, 415 F.3d at 461; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

When applying the substantial evidence standard on review, the court scrutinizes the record to determine whether such evidence is present. *Perez*, 415 F.3d at 461; *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).   In determining whether substantial evidence of

disability exists, the court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history. *Perez*, 415 F.3d at 462 (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *Id.* at 461 (citing *Richardson*, 402 U.S. at 390); *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Audler*, 501 F.3d at 447; *Masterson*, 309 F.3d at 272. In short, conflicts in the evidence are for the Commissioner, not the courts, to resolve. *Perez*, 415 F.3d at 461; *Masterson*, 309 F.3d at 272.

## IV.   ANALYSIS

### A.   Statutory Basis for Benefits

Williams applied for both Social Security disability insurance and Supplemental Security Income (SSI) benefits. Social Security disability insurance benefits are authorized by Title II of the Social Security Act. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement,

provided they are both insured *and* disabled, regardless of indigence. 42 U.S.C. § 423(c) (definition of insured status); 42 U.S.C. § 423(d) (definition of disability).

SSI benefits are authorized by Title XVI of the Social Security Act, and provide an additional resource to the aged, blind and disabled to assure that their income does not fall below the poverty line. 20 C.F.R. § 416.110. Eligibility for SSI is based on proof of disability and indigence. 42 U.S.C. § 1382c(a)(3) (definition of disability); 42 U.S.C. §§ 1382(a) (financial requirements). A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which he applies for benefits, no matter how long he has actually been disabled. *Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); 20 C.F.R. § 416.335. Thus, the month following an application fixes the earliest date from which SSI benefits can be paid. Eligibility for SSI, unlike eligibility for Social Security disability benefits, is not dependent on insured status.

Although these are separate and distinct programs, applicants to both programs must prove "disability" under the Act, which defines disability in virtually identical language. Under both provisions, "disability" is defined as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42

U.S.C. § 423(d)(1)(A) (disability insurance); 42 U.S.C. § 1382c(a)(3)(A) (SSI). The law and regulations governing the determination of disability are the same for both programs. *Greenspan*, 38 F.3d at 236.

### B.   <u>Determination of Disability</u>

When determining whether a claimant is disabled, an ALJ must engage in a five-step sequential inquiry, as follows: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment in Appendix 1 of the regulations; (4) whether the claimant is capable of performing past relevant work; and (5) whether the claimant is capable of performing any other work. *Perez*, 415 F.3d at 461; *Newton*, 209 F.3d at 453.[2] The claimant has the burden to prove disability under the first four steps. *Perez*, 415 F.3d at 461; *Myers*, 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner at Step Five to show that the claimant is capable of performing other substantial gainful employment that is available in the national economy. *Perez*, 415 F.3d at 461; *Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236.  Once the Commissioner

---

[2]     The Commissioner's analysis at steps four and five is based on the assessment of the claimant's residual functional capacity ("RFC"), or the work a claimant still can do despite his or her physical and mental limitations. *Perez*, 415 F.3d at 461-62. The Commissioner assesses the RFC before proceeding from Step Three to Step Four. *Id.*

makes this showing, the burden shifts back to the claimant to rebut the finding. *Perez*, 415 F.3d at 461; *Newton*, 209 F.3d at 453. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Perez*, 415 F.3d at 461 (citing 20 C.F.R. § 404.1520(a)).

In this case, at Step One, the ALJ determined that Williams had not engaged in substantial gainful activity since February 8, 2012, her alleged onset date.[3] The ALJ found at Step Two that Williams had two severe impairments: severe osteoarthritis of the right knee and obesity. She determined that Williams' depression, hypertension, status-post fractured ankle, type 2 diabetes mellitus, headaches, anemia, and insomnia were all non-severe impairments. At Step Three, the ALJ concluded that Williams' impairments, considered singly or in combination, did not meet or medically equal a listed impairment in the relevant federal regulations.

Before proceeding to Step Four, the ALJ assessed Williams' residual functional capacity ("RFC") and found that Williams could perform sedentary work with additional limitations:

> [Williams] has the [RFC] to perform sedentary work . . . , except that in addition to retaining the ability to lift/carry/push/pull up to 10 pounds, occasionally and less than 10 pound[]s frequently, with standing/walking up to 2 hour[s] of an 8-hour workday and sitting for 6 hours, she has

---

[3]   The ALJ also determined that Williams met the insured status requirements of the SSA through December 31, 2016.

> additional limitations.  [Williams] can occasionally crawl, crouch, kneel, and climb stairs/ramps.  [She] can frequently stoop and balance.  [She] should do no lifting or carrying while standing or walking due to her use of an assistive device.

R. 20.  At Step Four, the ALJ determined that Williams was unable to perform her past relevant work as a certified nurse assistant, fast food worker, or cashier.  Given Williams' age, education, work experience, and RFC, the ALJ determined at Step Five that Williams was capable of performing jobs that exist in significant numbers in the national economy, in particular, optical goods assembler, charge account clerk, and surveillance monitor.   She therefore concluded that Williams was not disabled from February 8, 2012, through December 20, 2013, the date of her decision.

### C.    **Plaintiff's Arguments for Reversal**

#### 1.    **Step Two Findings Regarding Severity**

Plaintiff argues that the ALJ erred when she found at Step Two that Williams' depression and migraine headaches were not severe.  The ALJ determined that Williams' osteoarthritis in her right knee and her obesity were severe impairments because these impairments "caused more than slight limitations in the claimant's ability to perform work-related activities."  R. 18 (citing *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985); 20 C.F.R. § 404.1520(c); 20 C.F.R. § 416.920(c)).  As for Williams' other impairments, the ALJ determined as follows:

The claimant has also been diagnosed with depression, hypertension,

status/post fractured ankle, type II diabetes mellitus, headaches, anemia, and insomnia. The evidence did not show that these impairments caused more than slight limitations in the claimant's ability to perform work-related activities. They were, therefore, non-severe impairments according to the [*Stone*] standard cited above.

R. 19.

Williams argues that the ALJ's Step Two determination regarding her depression and headaches was inadequately supported because the ALJ offered "literally no explanation" for her conclusions. In fact, the ALJ did discuss some evidence regarding Williams' alleged depression when making her Step Two finding, but she did not specifically discuss Williams' headaches at Step Two. R. 18-20.[4]

To the extent the ALJ erred at Step Two by failing adequately to address evidence of Williams' depression and headaches, no remand of this case required. Fifth Circuit authority does not require remand based on the outcome of Step Two when the non-severe impairments were considered in subsequent stages of the ALJ's analysis. *See Herrera v. Commissioner of Social Security*, 406 F. App'x 899, 903 (5th

---

[4]     Plaintiff cites to cases purportedly holding that an ALJ determination that fails to provide a rationale for its conclusions is not supported by substantial evidence and cannot be affirmed. Plaintiff's Brief, at 8 & n.17 (citing *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000); *Gittens v. Astrue*, 2008 WL 631215 (N.D. Tex. 2008)). The case law cited by Plaintiff is not on point because it pertains to an ALJ's failure to explain the rejection of a medical opinion from a treating physician. An ALJ's consideration of a treating physician's medical opinion is subject to particularly stringent requirements. *See Newton*, 209 F.3d at 455-56. The cited case law does not impose the same requirement on an ALJ's finding of nonseverity at Step Two.

Cir. 2010); *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987); *Chaparro v. Bowen*, 815 F.2d 1008, 1011 (5th Cir. 1987); *Jones v. Astrue*, 851 F. Supp. 2d 1010, 1015-18 (N.D. Tex. 2012).  *Compare Loza*, 219 F.3d 378 (remanding based on an erroneous Step Two denial when the ALJ did not consider relevant evidence at later stages of the analysis).  The ALJ in this case did not deny relief based on the outcome of Step Two. Rather, after holding that Williams' depression and headaches were non-severe impairments, she proceeded to Steps Three through Five of the sequential analysis and considered the effects of all of Williams' alleged impairments, including her depression and headaches, when determining Williams' RFC.[5]

Summary judgment is granted for Defendant on Plaintiff's Step Two issue.

## 2.   RFC Finding

Plaintiff further argues that the ALJ's purported Step Two error was not harmless because it is "by definition" a failure to make an RFC finding addressing all of her impairments and limitations.  Plaintiff's Brief, at 14.  She cites to case law, federal regulations, and administrative rulings stating that an RFC assessment must take into account all relevant evidence.  *Id.* at 14-15 (citing, *inter alia*, *Loza*, 219 F.3d at 395; 20 C.F.R. § 404.1545; SSR 96-8p).  She argues that, even assuming that the

---

[5]     Moreover, as discussed *infra*, those determinations were supported by substantial evidence in the record.

ALJ satisfied Step Two requirements by finding other impairments severe, the ALJ nevertheless erred because "Williams' depression and headaches plainly imposed work-related limitations" and the ALJ's assessment of William's RFC failed to "explicitly or implicitly address" the depression or headaches. *Id.* at 15.

In fact, however, the ALJ did expressly consider Williams' depression and headaches when assessing her RFC.  As for depression, the ALJ noted Williams' hearing testimony that she had stopped working as a nursing assistant because of knee pain and depression, that medications helped alleviate her depressive symptoms, and that she had three bad days per week due to depression when she stayed in bed crying. R. 21.  She then discussed other alleged symptoms and stated, "I carefully noted that these symptoms, and the severity and frequency were not regularly reported to the claimant's healthcare providers."  R. 21.  In her subsequent review of the medical evidence, the ALJ discussed certain records from the Lone Star Family Health Center regarding Williams' depression.  R. 22-23 (citing, *inter alia*, Exhibits 8F and 14F). Moreover, the ALJ analyzed relevant evidence at Step Two of her analysis and specifically discussed records regarding depression from TriCounty MHMR and Williams' consultative examination with Dr. Woodrick. R. 19-20 (discussing Exhibits 5F, 7F, and 13F).

Although Plaintiff directs the Court's attention to some conflicting evidence in

the record,[6] substantial evidence supports the ALJ's conclusion on this point. *See Copeland*, 771 F.3d at 923 (substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and is more than a mere scintilla but less than a preponderance). In particular, as noted by the ALJ, Williams was prescribed medication for her depression and "reported good results from Lexapro." R. 24; *see* R. 436 (Williams reported at TriCounty MHMR on January 16, 2013, that she felt less depressed on Lexapro); R. 460 (noting improvement in depression on April 17, 2013). The ALJ also relied on the fact that psychological consultants who reviewed Williams' medical records for the SSA found her depression to be non-severe. R. 24 (citing Exhibits 4F, dated October 22, 2012, and 11F, dated January 25, 2013).[7] Moreover, the ALJ concluded that Williams' statements regarding her symptoms were "not entirely credible," R. 24, a finding squarely within the ALJ's province. *See Perez*, 415 F.3d at 461 (conflicts in the evidence are for the Commissioner, not the courts, to resolve); *Audler*, 501 F.3d at 447 (court may not reweigh evidence or substitute its judgment for that of Commissioner).

---

[6]     In her briefing regarding her depression, Plaintiff cites essentially to the same records as those cited by the ALJ, although she highlights different portions. *See* Plaintiff's Brief, at 9-12 (citing Exhibits 5F, 7F, 8F, and 13F).

[7]     The Court also notes that, at Williams' psychological consultative examination on September 11, 2012, Dr. Woodrick stated that Williams' prognosis was "fair with adequate medical and mental health intervention" and '[g]uarded without." R. 299.

Because the ALJ's determination regarding Williams' depression is supported by substantial evidence, it is conclusive and must be affirmed. *See Perez*, 415 F.3d at 461.

As pertains to Williams' allegations of headaches, the ALJ noted that Williams complained of daily headaches at her consultative examination in September 2012, but had denied headaches in April and May 2013. R. 23 (citing Exhibits 2F, 14F and 16F). Williams argues that the record does not support the ALJ's finding, pointing to Lone Star Family Health Center's records reflecting Plaintiff's complaints of frequent migraine headaches in August and September 2012 and her complaint regarding headaches during a follow up visit on February 1, 2013. Plaintiff's Brief, at 12-14 (citing Exhibit 8F). Plaintiff also cites to her testimony in July 2013 at her administrative hearing that she suffered from frequent headaches. *Id.* (citing R. 47). She argues in her Reply, at 3, that her hearing testimony regarding her frequent headaches lasting four to five hours clearly demonstrates a more than minimal impact on her ability to work.

The ALJ made no specific findings regarding Williams' headaches. However, the ALJ did determine generally that Williams' statements regarding her symptoms were "not entirely credible," R. 24. She also "carefully noted" that Williams' alleged symptoms, including her hearing testimony regarding frequent migraine headaches,

"were not regularly reported to [Williams'] healthcare providers." R. 21. As stated above, the ALJ was entitled to make this credibility determination. *See Perez*, 415 F.3d at 461; *Audler*, 501 F.3d at 447. Moreover, the ALJ's determination regarding headaches is supported by evidence in the record as a whole. In particular, it appears that Plaintiff's headaches were largely controlled by medication prescribed in September 2012, *see* R. 340-41, because the records of numerous visits to medical providers between then and February 2013 reflect no complaints of headaches. Even on February 1, 2013, when Williams again complained of headaches, the records reflect Williams' statement that prescription medication alleviated the pain. R. 526. An impairment that can be controlled with medication is not disabling. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); 20 C.F.R. § 404.1530(b); 20 C.F.R. § 416.930(b). *See Sanchez v. Astrue*, 265 F. App'x 359, 361 (5th Cir. 2008). The ALJ's determination that Plaintiff's headaches were not disabling is supported by substantial evidence. *See Perez*, 415 F.3d at 461. Plaintiff's arguments to the contrary are unavailing.

Defendant accordingly is entitled to summary judgment.

## V. <u>CONCLUSION</u>

For the foregoing reasons, it is hereby

**ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. # 11] is

**DENIED**.   It is further

ORDERED that Defendant's request for summary judgment [Doc. # 13] is

**GRANTED**.

A separate final judgment will issue.

**SIGNED** at Houston, Texas, this  19th day of February, 2015.

Nancy F. Atlas
United States District Judge